IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JENNIFER GRABIANSKI and JACK )
STAPLETON, EUGENE FRIDMAN, EDWARD )
RAECEK, BRIAN M. DROMGOOLE, RONNIE )
KEHATI, AND JOSEPH V. ESPOSITO, )
on behalf of themselves and others )
similarly situated, ) No. 12 C 284
 )
      Plaintiffs, )
 )
  v. )
 )
BALLY TOTAL FITNESS HOLDING CORP., )
and L.A. FITNESS INTERNATIONAL, LLC, )
and FITNESS INTERNATIONAL, LLC )

Defendants.

## MEMORANDUM OPINION AND ORDER

On October 11, 2012, plaintiffs filed an amended complaint pursuant to my dismissal of their original complaint with leave to replead. *See Grabianski v. Bally Total Fitness Holding Corp.*,--- F.Supp.2d—, 2012 WL 3987747 (N.D. Ill. Sept. 11, 2012). The amended complaint asserts six counts. The first two are breach of contract claims asserted against Bally (count I), and, in the alternative, against LA Fitness International and Fitness International (collectively, "LA Fitness") (count II). The next two counts, both against LA Fitness, assert breach of an implied contract (count III), and a breach of the November 30, 2011, Asset Purchase Agreement ("APA") between Bally and LA Fitness, as to which plaintiffs claim the status of third-party beneficiaries (count IV).

1

The fifth and sixth counts, against Bally and LA Fitness respectively, both assert violations of the Arizona, Florida, Illinois, New Jersey, and New York consumer protection statutes. Bally and LA Fitness have moved to dismiss the complaint in its entirety. For the following reasons, I grant each of their motions in part.

I.

Because the factual background to plaintiffs' claims remains largely unchanged from how I described it in *Grabianski*, I need not rehearse it again in great detail. In short, plaintiffs allege that between 1986 and 2002, they entered into membership agreements with Bally,[1] an expansive fitness outfit operating a chain of health clubs across the United States. Plaintiffs purchased "Premier Plus" or "Premier" membership plans, which entitled them to use (with immaterial exceptions) any club in Bally's nationwide network. Some plaintiffs purchased their memberships from Bally, while others purchased them on the secondary market, pursuant to provisions in the membership agreements explicitly permitting transfer of "Premier Plus" and "Premier" plans. Some plaintiffs made substantial up-front payments to obtain their memberships--as much as $2,500 in one plaintiff's case--and all pay modest annual maintenance fees--between ten and sixty dollars per year.

---

[1] In one instances, the original agreement was with a Bally predecessor.

Then Bally went bankrupt. After emerging from bankruptcy in 2009, Bally downsized, selling 171 of its roughly 271 clubs to LA Fitness. An Asset Purchase Agreement effectuating the sale closed on November 30, 2011. Plaintiffs allege that pursuant to the APA, LA Fitness assumed responsibility for their membership agreements.

Nevertheless, after the APA closed, plaintiffs became unable to access the clubs they had customarily used--now owned by LA Fitness--or any Bally club reasonably convenient to them. This, despite plaintiffs' continued payment of maintenance fees pursuant to their membership agreements, and despite defendants' public statements that LA Fitness would "assume" those agreements. When plaintiffs tried to use the newly-converted clubs, they were denied access on the basis that their "home clubs" had not been acquired as part of the APA. According to defendants, plaintiffs' "home clubs" were the clubs at which their memberships had originated, even if those clubs were hundreds of miles away and had never been used by plaintiffs. This was the case, for example, for plaintiff Grabianski, an Illinois resident who purchased her membership on the secondary market from a Bally member in New York. It was also the case for plaintiff Stapleton, an Illinois resident who bought his membership from a former Bally member whose plan originated at a club in St. Louis, Missouri that, at least as of the APA, was no longer open. And it was the case for plaintiff Fridman, whose membership was purchased as a gift at a Bally club in Texas, and who

3

later moved to Arizona. In all of these instances, and in similar ones alleged by other plaintiffs, LA Fitness informed plaintiffs that it would not honor their membership agreements.[2] Although plaintiffs could, theoretically, continue to access Bally gyms that had not been sold to LA Fitness, none were located anywhere near where plaintiffs live.

II.

Bally asserts at the outset that all of the claims brought by plaintiffs Fridman, Raecek, Dromgoole, Kehati, and Esposito (the "*Fridman* plaintiffs") are precluded by the order of dismissal in *Fridman et al. v. Bally Total Fitness Holding Corp. et al.*, No. 2:12-cv-707-ODW (C.D. Cal. Sept. 25, 2012). In that case, which asserted federal jurisdiction based on diversity, Judge Wright dismissed the case *sua sponte* without prejudice on the ground that no individual plaintiff's claim satisfied the minimum amount in controversy, and that Ninth Circuit law precluded aggregating their damages for jurisdictional purposes. Bally argues that because Judge Wright's ruling was final and appealable, the *Fridman* plaintiffs have "no legal right" to join the present case.

Bally's argument is meritless. Although its motion states that "well-settled principles of claim preclusion" bar the *Fridman*

---

[2] In the cases of plaintiffs Stapleton, Fridman, and Raecek, LA Fitness ultimately agreed to "transfer" their membership agreements. I agree with plaintiffs, however, that if they prevail on their claims, they may nevertheless be entitled to damages for the time they were unable to access the clubs.

4

plaintiffs from bringing their claims in this forum, Bally nowhere identifies any framework for effectuating these principles or explains why the relevant legal standard is met in this case. Indeed, the precise theory under which Bally travels is murky. While its motion asserts claim preclusion, its brief cites, seemingly indiscriminately, some cases involving claim preclusion and others involving issue preclusion, though these are distinct legal principles that must be analyzed and applied differently.

Bally conspicuously does *not* argue that I lack subject matter jurisdiction over this case (and, indeed brings its motion under Rule 12(b)(6), not Rule 12(b)(1)). Yet that is the only issue susceptible to preclusion. As one of Bally's own authorities recognizes, "a jurisdictional dismissal precludes only the relitigation of the ground of that dismissal." *Okoro v. Bohman*, 164 F.3d 1059, 163 (7th Cir. 1999) (citing cases). Accordingly, *Okoro* explains, a jurisdictional dismissal "has collateral estoppel (issue preclusion) effect rather than the broader res judicata effect that nowadays goes by the name of claim preclusion." *Id*. The only issue arguably precluded by Judge Wright's order, then, is whether *that* court had subject matter jurisdiction over the *Fridman* case, not whether I have jurisdiction over this case. *See Magnus Electronics v. La Republica Argentina*, 830 F.2d 1396, 1400 (7th Cir. 1987) ("[a] judgment dismissing a suit for lack of jurisdiction does not preclude a party from litigating the same cause of action in a

5

*court of competent jurisdiction*...however, it does 'preclude relitigation of the issue of whether *the first tribunal* had jurisdiction.'") (citations omitted) (original emphasis). Accordingly, Judge Wright's order does not preclude the *Fridman* plaintiffs from joining this case.

Of course, were I to conclude, independently of Bally's arguments, that I lacked subject matter jurisdiction over this case, I would be required to dismiss it *sua sponte*. But I discern no basis on the record as it now stands for doing so under the law of this circuit.

Bally next argues that plaintiffs' contract claims must be dismissed on the ground that those claims seek to enforce obligations that Bally never undertook, and that were not within the scope of the parties' membership agreements. Bally characterizes "the gravamen of Plaintiffs' amended complaint" as the claim that "Bally breached Plaintiffs' 'Premier Plus' membership contract by closing clubs, thereby not providing clubs convenient to them." Bally's Mem. at 6. But this plainly misreads plaintiffs' claims. Plaintiffs do not complain that Bally closed clubs. What plaintiffs complain about is that defendants denied them access to *open* clubs (which are, in fact, convenient to them), in violation of their contractual rights, which include the right to access any Bally club in the nation. *See* Cmplt., Exh. A at ¶ 20 (describing "Premier Plus" and "Premier" membership plans as providing members "with the

6

use of all local and nationwide Bally Total Fitness clubs").

Plaintiffs further characterize Bally's breach as the unilateral termination of plaintiffs' membership agreements on a basis that is not authorized on the face of the agreements and is inconsistent with the agreements' stated terms. Specifically, plaintiffs allege that Bally imported into the agreements a "home club" restriction that does not appear in, and was not contemplated by, the agreements, then relied upon that restriction as a purported basis for extinguishing plaintiffs' contractual rights. It is true that the term "home club" does not appear anywhere in the contracts.

Both Bally and LA Fitness insist that they cannot, as a matter of law, be held liable for breach of contract based on these allegations because they were entitled to terminate the membership agreements for any reason whatsoever, or for no reason at all. Illinois law compels this conclusion, defendants contend, because the membership agreements are of indefinite duration and therefore terminable at will.

Defendants point to provisions articulated in ¶¶ 6-8 of the membership agreements, which enumerate circumstances in which members "may" cancel their contracts. These paragraphs state that members may cancel their contracts in the event of the following circumstances: the member's death or disability (¶ 6); the member's relocation to an area not within twenty-five miles of the member's "club of enrollment" or "any other club which Member is entitled

7

to use" under his or her membership plan, or "any club with comparable facilities and services which will honor the membership at no additional charge" (¶ 7); or the closure of the member's "club of enrollment" or "any other club which Member is entitled to use" under his or her membership plan, "or any club with comparable facilities and services which will honor the membership at no additional charge" (¶ 8). Bally further cites ¶ 21, which states, "[m]onthly dues charges will continue to be due each month regardless of your use of the club until you notify us in writing that you wish to cancel this Contract," then explains the logistics of how to effectuate the cancellation. According to defendants, these paragraphs establish their "express, unfettered right to terminate the agreement upon proper notice." Bally's Memo. at 6.

I disagree. Defendants liken the membership agreements to the contract at issue in *Jespersen v. Minn. Mining & Mfg. Co.*, 700 N.E. 2d 1014 (Ill. 1998), which the Illinois Supreme Court held was terminable at will because its duration was indefinite. But the contract in *Jespersen* expressly provided that it "shall continue in force indefinitely," unless terminated pursuant to certain events, all of which amounted to material breaches. The membership agreements here, by contrast, contain no such terms. It is true that the contracts do not specify any fixed duration. They do, however, set forth explicit circumstances in which members may *not* invoke the cancellation rights established in ¶¶ 7-8 (dealing with

member relocation and club closures): "[i]f any of these clubs are within 25 miles of [the new/your] residence, *you will not be permitted to cancel the membership*" (emphasis added). These explicit restrictions on termination cannot be squared with Bally's proffered interpretation of the membership agreements as granting both parties the "express, unfettered right to terminate the agreement on proper notice." *Jespersen*, 700 N.E. 2d at 1017. While the "general rule" may be that contracts of indefinite duration are construed as terminable at will, in this case-unlike in *Jespersen*-affirmative contractual provisions militate against such a construction. *Jespersen* is further distinguishable (as is *Profile Products, LLC v. Soil Management*, 155 F.Supp.2d 280, 883 (N.D. Ill. 2001)), in that here, the cancellation provisions do not entitle members to terminate the agreement only in the event of circumstances amounting to a material breach. Accordingly, those provisions are not mere "transcrpition[s]" of the universal rule that "*any* contract is terminable upon the occurrence of a material breach." *Jespersen,* 700 N.E. 2d at 1016-17 (original emphasis).

Nor does ¶ 21 of the membership agreement establish the "express, unfettered right" to terminate the agreement. On its face, that paragraph simply specifies that monthly dues are payable, and will be charged to members, until such time as cancellation is effected. It says nothing about the circumstances under which cancellation is allowed under the agreements. Bally's construction

9

of ¶ 21 as authorizing either party to terminate the agreement at will would render the cancellation provisions of ¶¶ 6-8 superfluous, and would eviscerate entirely the portions of those provisions that state instances in which members are "not permitted" to cancel.[3] Courts "must, of course, interpret a contract as a whole, and we must try to give meaning and effect to each provision in the contract," *Echo, Inc. v. Whitson Co., Inc*., 121 F.3d 1099, 1105 (7th Cir. 1997). Read in the context of the membership agreements as a whole, ¶ 21 cannot reasonably be construed as establishing defendants' "express, unfettered right," as a matter of law, to terminate the membership agreements.

LA Fitness additionally argues that it cannot be liable for breaching the membership agreements because plaintiffs' allegations, together with the APA, establish conclusively that LA Fitness did not acquire those agreements. But I agree with plaintiffs that they are entitled to discovery to determine whether their membership agreements were, in fact, assigned to LA Fitness. Among other issues that cannot be ascertained from the record as it currently stands are the meaning defendants attributed to the phrase "members assigned to any Seller Club," within the APA's definition of the term "Acquired Members," and the process defendants used for

---

[3] I note that the agreements contain other provisions–including the description of membership plans as "renewable" or "nonrenewable"–that, while less directly contrary to defendants' asserted construction, nevertheless undermine their characterization of the agreements as indefinite.

effectuating such "assignments." *See* Cmplt., Exh. B, *Definitions*. Nothing on the face of plaintiffs' membership agreements purports to "assign" their memberships to any particular club. Some membership plans identified in ¶ 20 expressly restrict members' use of Bally's facilities to the "club of enrollment." But even if this distinct phrase were somehow interpreted to mean the members' clubs of "assignment," no such restrictions apply to the Premier Plus and Premier plans plaintiffs purchased. How defendants determined plaintiffs' club assignments, and whether those assignments were consistent with plaintiffs' rights under their membership agreements, are questions that cannot be answered at this stage.

LA Fitness next argues that the third count of plaintiffs' amended complaint, which claims that LA Fitness breached an implied contract, is fatally flawed because plaintiffs have not alleged any consideration to support the formation of an implied contract. This challenge has merit. LA Fitness cites, *inter alia*, *Brody v. Finch Univ. of Health Sci./The Chicago Med. Sch.*, 689 N.E. 2d 257, 265 (Ill. App. Ct. 1998), which held that "[a] contract implied in fact contains all of the elements of an express contract," including "an offer, a strictly conforming acceptance to the offer, and *supporting consideration*." *Id*. at 265 (emphasis added). Plaintiffs do not dispute that no consideration was exchanged with LA Fitness, but they argue that the consideration supporting their original contracts with Bally is sufficient to create an implied contract

with LA Fitness. They offer no authority, however, for this novel legal theory. Indeed, plaintiffs cite only one case, *Wood v. Wabash County*, 722 N.E. 2d 1176 (Ill. App. Ct 1999), in response to LA Fitness's argument. But "[t]he only issue raised" in that case was "whether the language of defendant's personnel policy handbook contained a sufficiently clear promise" to give rise to an implied contract. Because the court made no mention at all of the obviously distinct issue of consideration LA Fitness raises, plaintiffs' citation to this case does not advance their cause.

LA Fitness next argues that plaintiffs' fourth count, which plaintiffs assert as putative third-party beneficiaries of the APA, and alleges a breach of that agreement is fatally flawed for several reasons. I need not grapple with all of their arguments because I am persuaded that the APA, on its face, negates plaintiffs' claim to third-party beneficiary status.

Regardless of whether Illinois law or Delaware law governs the issue (I need not decide because the result is the same in either event), plaintiffs' own authorities reinforce LA Fitness's characterization of courts in both jurisdictions as "cautious" and "reluctant" to accord third-party beneficiary status to non-contracting parties. Indeed, in both of the cases plaintiffs cite that apply Delaware law (their favored jurisdiction), as in all of the cases LA Fitness cites from both Delaware and Illinois, the court rejected claims brought by putative third-party beneficiaries.

12

*See Insurance Co. of North America v. Waterhouse*, 424 A.2d 675 (Del. Super. Ct. 1980) (acknowledging general rule that "a third-party may recover on a contract made for his benefit" but declining to accord third-party beneficiary status where "there [was] nothing to indicate" that contracting party intended to confer benefit to third party); *American Financial Corp. v. Computer Sciences Corp.*, 558 F. Supp. 1182, 1185 (D. Del. 1983) (same).

The parties agree that the issue turns on the intent of the contracting parties. Here, the parties memorialized their intent with respect to this very issue in § 12.3 of the APA which states, "[n]otwithstanding any other provision of this Agreement, this Agreement shall not create benefits on behalf of any other Person not a party to this Agreement." Plaintiffs insist that boilerplate disclaimers such as this do not constitute an "absolute bar" to claims brought by putative third-party beneficiaries. But the authorities on which they rely are not only from Georgia and Pennsylvania, they are distinguishable on their facts. In plaintiffs' first case, the putative "no third party beneficiary" clause conflicted with other specific contractual provisions. *Vaughn, Coltrane & Associates v. Van Horn Construction, Inc.*, 563 S.E.2d 548 (Ga. App. Ct 2002) (contractual clause excluded some third-party claims, but other provisions of the agreement specifically contemplated certain third-party benefits). Their second case, *Ario v. Reliance Ins. Co.*, 981 A.2d 950 (Pa. Commw. Ct.

13

2009), involved a reinsurance agreement, and the issues involved were so distinct as to offer little guidance in the present case. In any event, even if true as a general matter, plaintiffs' insistence that the APA's generic "no third party beneficiaries" clause "cannot nullify [LA Fitness's] specific statements in the APA concerning its intent to benefit Bally Premier members" rings hollow in view of their failure to identify any such specific statements.

I now move on to plaintiffs' statutory consumer fraud claims, which I conclude cannot proceed past the pleading stage. To begin, I agree with both defendants that the conduct plaintiffs assert in support of these claims is generally the same conduct underlying their contractual claims. "When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract." *Greenberger v. GEICO General Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011). Indeed, "a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract." *Id.* (quoting *Avery v. State Farm Mutual Automobile Insurance Co.*, 835 N.E.2d 801, 844 (2005)). Nor do plaintiffs' allegations that defendants' conduct amounted to a "pattern and practice" of breach, or their conclusory assertion that the conduct "implicates consumer protection concerns," suffice to bring their

14

claims into the realm of consumer fraud. *Greenberger*, 631 F.3d at 400.

Second, although plaintiffs nowhere refer to the elements they must establish to prevail under any of the consumer fraud statutes they assert, they acknowledge that they must show "more than broken promises." In Illinois, for example, plaintiffs must allege that defendants intended plaintiffs to rely on their deceptive acts or practices. *Avery*, 835 N.E. 2d at 850. But the complaint, read in its entirety, does not reasonably suggest that defendants harbored such an intent. Plaintiffs argue that defendants' conduct "induc[ed] them to enter into *new* membership agreements, and paying *additional* fees that were not required under the agreements." Pl.'s Opp. at 27 (original emphasis). But not only does this argument find no factual mooring in the complaint (which does not allege that any plaintiff in fact entered into such a new membership agreement, or paid any additional fees), the allegedly unfair conduct occurred years after the plaintiffs purchased their memberships. Even if defendants wrongfully terminated or abridged plaintiffs' contractual rights after the Asset Purchase Agreement closed in November of 2011, nothing in the complaint suggests that defendants intended, at the time plaintiffs entered into their respective membership agreements (in 1986, 1989, 1991, 1995, 1999 or 2000, and 2002, according to the complaint), to dupe plaintiffs into purchasing

15

something that they knew would one day be worthless.[4]  *See Hausen v. PS Illinois Trust,* No. 11 C 6888, 2012 WL 266169 at *6 (N.D. Ill. Jan. 29, 2012) (Kennelly, J.) ("a plaintiff seeking to make a ICFA claim relating to a contract must allege that the 'defendant planned in advance not to honor the representations it made in the contract or that it would not have been possible or feasible to do so.'" (Citations omitted).  In fact, plaintiffs themselves emphasize that they "used and enjoyed" Bally's facilities pursuant to the terms of their membership agreements for many years.

While not all of the state statutes plaintiffs assert require similar intent, plaintiffs do not dispute that courts in each jurisdiction require consumer fraud claims to allege something more than merely broken contracts.  Here, the only wrongful conduct plaintiffs attribute to defendants that is even arguably separate from the conduct underlying their breach of contract claims is "concealing...the cut-off date for transferring memberships from members' 'home clubs'" and "concealing...the procedures LA Fitness required of Bally Premier and Premier Plus members so that they could maintain and use their memberships in the vicinity of their homes and businesses."  But even assuming that defendants could be found liable under the asserted statutes for affirmatively

---

[4]As Bally observes, this theory is especially implausible as to plaintiffs Grabianski and Stapleton, as they purchased their memberships on the secondary market from other members, not from Bally.

16

concealing this information, plaintiffs' conclusory allegations of "concealment" are insufficient to raise plaintiffs' right to relief on this theory "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To be sure, plaintiffs allege that defendants' employees informed them that their Bally memberships could not be transferred to LA Fitness, either because the time for doing so had expired, or because according to defendants' records, plaintiffs' memberships did not entitle them to do so. But these allegations fall short of plausibly alleging that defendants intentionally concealed information in an effort to extract "new membership agreements" or "additional fees "from plaintiffs.

### III.

For the foregoing reasons, defendants' motions to dismiss are granted in part. Plaintiffs' breach of contract claims asserted in counts I and II of the amended complaint may proceed. The remainder of their claims are dismissed.

**ENTER ORDER:**

*[signature: Elaine E. Bucklo]*

**Elaine E. Bucklo**
United States District Judge

Dated: February 21, 2013

17